Ronald A. Marron, Esq. (SBN: 175650)
**LAW OFFICES OF RONALD A. MARRON, APLC**
3636 Forth Avenue, Suite 202
San Diego, CA 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN GORE, Derivatively On Behalf of ARENA PHARMACEUTICALS, INC., | Case No. |
| Plaintiff, | **'10 CV 2344 JM   NLS** |
| vs. | |
| JACK LIEF, DOMINIC P. BEHAN, DONALD D. BELCHER, SCOTT H. BICE, HARRY F. HIXSON, JR., TINA S. NOVA, SCOTT M. SCHNEIDER, CHRISTINE A. WHITE, M.D. and RANDALL F. WOODS, | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| -and- | |
| ARENA PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

1.     Plaintiff MARTIN GORE, ("Plaintiff"), by his attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") against certain officers and directors of Arena Pharmaceuticals, Inc. ("Arena" or the "Company"). Plaintiff asserts state law claims for breach of fiduciary duty against the Individual Defendants (as defined in ¶ 23 below).

2.     Plaintiff bases his allegations upon information and belief, except those allegations concerning himself, which are based upon his personal knowledge. Because Plaintiff lacks access to all information and documents on which his claims are based, certain of his allegations are made by

Verified Shareholder Derivative                     - 1 -
Complaint

1  necessity upon information and belief. After Plaintiff has had the opportunity to conduct discovery,
2  he will, to the extent necessary and appropriate, amend or seek leave to amend this Complaint.
3  Plaintiff's allegations made on information and belief are derived from his and his counsel's
4  investigation, which included counsel's review and analysis of the following: (i) Arena's filings with
5  the United States Securities and Exchange Commission ("SEC"); (ii) press releases, conference call
6  transcripts, public statements, analyst reports, news articles, and other publications by or pertaining
7  to Arena and the Defendants named herein; and (iii) other publicly available documents.

8         3.      Arena is a clinical-stage biopharmaceutical company focused on discovering,
9  developing and commercializing oral drugs that target G protein-coupled receptors ("GPCRs") in
10  four major therapeutic areas: cardiovascular, central nervous system, inflammatory and metabolic
11  diseases. The Company's principal drug in development is lorcaserin hydrochloride ("Lorcaserin"),
12  an experimental weight loss drug that has completed a pivotal Phase III clinical trial program. In
13  December 2009, Arena submitted a New Drug Application ("NDA") to the Food and Drug
14  Administration ("FDA") regarding Lorcaserin.

15         4.      A number of securities class action lawsuits have been filed against the Company and
16  certain of its officers and directors alleging Arena issued false and misleading statements about
17  Lorcaserin and its possibility of FDA approval and its potential success in the marketplace. Those
18  lawsuits allege that the price at which the Company's stock was trading during the several year class
19  period was artificially inflated because of the misrepresentations made by and on behalf of the
20  Company. For purposes of this action, Plaintiff alleges the allegations of wrongdoing in those
21  lawsuits are true. Those securities lawsuits filed to date in the Southern District of California are as
22  follows:  *Schueneman v. Arena Pharmaceuticals, Inc., et  al.*, Case No. 10-CV-1959 L (BLM);
23  *Sutliff v. Arena Pharmaceuticals, Inc., et al.,* Case No. 10-CV-1961 JLS (NLS); *Rubinstein v. Arena*
24  *Pharmaceuticals, Inc., et al.,* Case No. 10-CV-1984 L (NLS); and *Pratt v. Arena Pharmaceuticals,*
25  *Inc., et al.,* Case No. 10-CV-1977 DMS-AJB.

26         5.      Those lawsuits generally allege that the Company, through its Board of Directors and
27  its agents, issued materially false and misleading statements regarding Lorcaserin, claiming the
28  Company continuously hyped Lorcaserin's combination of efficacy, safety and tolerability and its

Verified Shareholder Derivative          - 2 -
Complaint

1 | potential for success without disclosing certain health risks associated with the drug. Those lawsuits
2 | allege that as a result of the Company's false statements, Arena's stock traded at artificially inflated
3 | prices during their alleged Class Period, December 8, 2008 and September 16, 2010, reaching a high
4 | of $7.95 per share on July 30, 2010.

5 |      6.     Similar to the other securities action complaints, one of the securities action
6 | complaints filed, *Pratt v. Arena Pharmaceuticals, Inc.*, Case No. 10-CV-1977 DMS-AJB ("*Pratt*"),
7 | alleges: "On September 14, 2010, the FDA issued a briefing document in advance of its advisory
8 | panel meeting in which the agency questioned both the safety and efficacy of Lorcaserin. According
9 | to the FDA staff scientist's analysis, Lorcaserin produced minimal weight loss results, barely
10 | meeting the agency's threshold for weight loss effectiveness, while at the same time raising certain
11 | cardiovascular and cancer safety risks. Most notably, the briefing document disclosed that the drug
12 | was associated with malignant tumors in rats. Investors were not aware of the results of rat
13 | carcinogenicity studies prior to the release of the FDA briefing document."

14 |      7.     The *Pratt* complaint further alleges that the market price of Arena common stock
15 | plummeted upon this news, collapsing $2.72 per share to close at $4.13 per share on September 14,
16 | 2010 – a one-day decline of 40% on high volume. And it further alleges, that on September 16,
17 | 2010, the FDA advisory panel voted 9 to 5 against approval of Lorcaserin, in large part because of
18 | the results of the rat carcinogenicity studies and the modest therapeutic benefits associated with
19 | Lorcaserin. On this news, Arena's stock fell another $1.75 per share to close at $1.99 per share on
20 | September 17, 2010 – a one-day decline of over 46% on high volume.

21 |      8.     The *Pratt* complaint, in paragraphs 7 and 8, also alleges that the representations made
22 | to the public and the marketplace were false and misleading and in violation of the law:

23 |     "7. The true facts, which were known by the defendants but concealed
24 |     from the investing public during the Class Period, were as follows:

25 |         a)   Defendants failed to disclose the truth concerning the
26 |            potential for increased cardiovascular and cancer safety
27 |            risks association with Lorcaserin, including the results of
28 |            the rat carcinogenicity studies; and

Verified Shareholder Derivative      - 3 -
Complaint

b)   Defendants failed to disclose the truth concerning the efficacy of Lorcaserin for weight loss.

"8.   As a result of defendants' false statements, Arena's stock traded at inflated levels during the Class Period.   However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 75% from their Class Period high."

9.      The Individual Defendants' failed to ensure adequate procedures were in place to prevent the events set out in detail in the securities lawsuits filed against the Company, including but not limited to making representations made to the public about Lorcaserin and its possibilities of success.   By failing to have such procedures in place, and failing to have sufficient checks and balances within the Company, as well as failing to live up to their duties as directors of the Company, the Board of Directors has damaged Arena and its shareholders.   Additionally, the Company's goodwill and reputation are materially undermined and tarnished as a direct result of the Individual Defendants' actions.

10.     Plaintiff brings this derivative action to: (i) recover monetary and restitutionary damages against the Individual Defendants for the benefit of the Company; and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect Arena and its shareholders from a repeat of the damaging events described below.

**JURISDICTION AND VENUE**

11.     This court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332, diversity jurisdiction.   This Court also has supplemental jurisdiction over any state law claims asserted herein pursuant to 28 U.S.C. Section 1367.   Arena maintains its principal executive office at 6166 Nancy Ridge Drive, San Diego, California 92121.   Thus, Arena is a resident and citizen of California and of this judicial district.   Venue is proper in this Court because some or all of the events giving rise to Plaintiff's claims occurred and/or had effect in this judicial district, the Company is located in this judicial district, and many of the Individual Defendants reside in this judicial district.   This action is not a collusive one to confer jurisdiction on a court of the United

Verified Shareholder Derivative                          - 4 -
Complaint

1   States which it would not otherwise have.

2   <div align="center">**PARTIES**</div>

3   12.   Plaintiff MARTIN GORE is an individual holder of Arena common stock and

4   shareholders of Arena at the time of the transactions of which Plaintiff complains.  Plaintiff

5   purchased Arena stock well before the actions complained of above that led to the stock price

6   collapse, and is the current holder of 1,000 shares and has held Arena shares continuously since

7   that time. Plaintiff is a citizen of the State of California.

8   13.   Nominal Defendant Arena is a corporation organized under the laws of Delaware

9   with its agent for service of process being Corporation Service Company, 2711 Centerville Road,

10   Suite 400, Wilmington, Delaware making it a citizen of Delaware for purposes of diversity.  Arena

11   is a clinical-stage biopharmaceutical company focused on developing and commercializing oral

12   drugs.   Arena has no drugs on the U.S. market.   Arena's principal drug in development is

13   Lorcaserin, to treat obesity.  Arena has submitted a NDA to the FDA regarding Lorcaserin.

14   14.   Defendant Jack Lief ("Lief") co-founded the Company and at all relevant times has

15   been the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board. Lief

16   is a citizen of La Jolla, California.

17   15.   Defendant Dominic P. Behan ("Behan") co-founded the Company and at all

18   relevant times has been the Company's Senior Vice President, Chief Scientific Officer and a

19   director.  Behan is a citizen of San Diego, California.

20   16.   Defendant Donald D. Belcher ("Belcher") at all relevant times has been a director of

21   the Company. Belcher is a member of the Audit Committee and of the Compensation Committee.

22   Belcher is a citizen of San Diego, California.

23   17.   Defendant Scott H. Bice ("Bice") at all relevant times has been a director of the

24   Company.  Bice is a member of the Compensation Committee and the Corporate Governance and

25   Nominating Committee. Bice is a citizen of Los Angeles, California.

26   18.   Defendant Harry F. Hixson, Jr. ("Hixson") at all relevant times has been a director

27   of the Company.  Hixson is a member of the Compensation Committee. Hixson is a citizen of La

28   Jolla, California.

Verified Shareholder Derivative          - 5 -
Complaint

1    19.    Defendant Tina S. Nova ("Nova") at all relevant times has been a director of the

2 Company.  Nova is a member of the Corporate Governance and Nominating Committee. Nova is a

3 citizen of Rancho Santa Fe, California.

4    20.    Defendant Phillip M. Schneider ("Schneider") at all relevant times has been a

5 director of the Company.  Schneider is a member of the Audit Committee.  Schneider is a citizen

6 of Poway, California.

7    21.    Defendant Christine A. White, M.D. ("White") at all relevant times has been a

8 director of the Company.   White is a member of the Audit Committee and of the Corporate

9 Governance and Nominating Committee.  White is a citizen of Temecula, California.

10    22.    Defendant Randall F. Woods ("Woods") at all relevant times has been a director of

11 the Company.   Woods is a member of the Compensation Committee and of the Corporate

12 Governance and Nominating Committee.  Woods is a citizen of Rancho Santa Fe, California.

13    23.    The defendants referenced above in ¶¶14-22 are referred to herein as the "Individual

14 Defendants."

15    24.    The Individual Defendants, because of their positions with the Company, possessed

16 the power and authority to control the contents of Arena's quarterly reports, press releases and

17 presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

18 the market.  They were provided with copies of the Company's reports and press releases alleged

19 herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

20 prevent their issuance or cause them to be corrected.  Because of their positions with the Company,

21 and their access to material non-public information available to them but not to the public, the

22 Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

23 were being concealed from the public and that the positive representations being made were then

24 materially false and misleading.  The Individual Defendants are liable for the false statements

25 pleaded herein.

26                **DUTIES OF THE INDIVIDUAL DEFENDANTS**

27    25.    By reason of their positions as officers, directors and/or fiduciaries of Arena, and

28 because of their ability to control the business and corporate affairs of Arena, the Individual

Verified Shareholder Derivative                          - 6 -
Complaint

1  Defendants owed Arena and its shareholders fiduciary obligations of trust, loyalty, good faith and
2  due care, and were and are required to use their utmost ability to control and manage Arena in a
3  fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in
4  furtherance of the best interests of Arena and its shareholders so as to benefit all shareholders
5  equally and not in furtherance of their personal interest or benefit.

6        26.    Each director and officer of the Company owes to Arena and its shareholders the
7  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the
8  Company and in the use and preservation of its property and assets, and the highest obligations of
9  fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual
10  Defendants had a duty to maintain sufficient and proper internal accounting controls and to
11  promptly disseminate accurate and truthful information with regard to the Company's revenue,
12  margins, operations, performance, management, projections and forecasts so that the market price
13  of the Company's stock would be based on truthful and accurate information.

14        27.    To discharge their duties, the officers and directors of Arena were required to
15  exercise reasonable and prudent supervision over the management, policies, practices and controls
16  of the financial affairs of the Company.  By virtue of such duties, the officers and directors of
17  Arena were required to, among other things:

18      a)  ensure that the Company implements and maintains effective internal accounting
19  and internal control policies and procedures to prevent any reportable and material
20  weaknesses with the Company's financial reporting;

21      b)  ensure that the Company complied with its legal obligations and requirements,
22  including acting only within the scope of its legal authority and disseminating
23  truthful and accurate statements to the SEC and the investing public;

24      c)  conduct the affairs of the Company in an efficient, business-like manner so as to
25  make it possible to provide the highest quality performance of its business, to avoid
26  wasting the Company's assets, and to maximize the value of the Company's stock;

27      d)  properly and accurately guide investors and analysts as to the true financial
28  condition of the Company at any given time, including making accurate statements

Verified Shareholder Derivative     - 7 -
Complaint

about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e) supervise the preparation and filing of any audits, reports, or other information required by law of the Company, and examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company, and make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth herein;

f) remain informed as to how Arena conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

g) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

28. The conduct of the Individual Defendants complained of herein involves a violation of their obligations as directors and officers of Arena, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

29. The Individual Defendants breached their duties of loyalty and good faith by allowing, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent the Company from taking such illegal actions.

30. The Individual Defendants, because of his positions of control and authority as directors and/or officers of Arena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of his advisory, executive, managerial, and directorial positions with Arena, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

31.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least 2008, and continuing thereafter. During this time, the Individual Defendants caused the Company to misrepresent and /or conceal the true facts as alleged herein.

32.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Arena common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

33.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

34.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Arena, and was at all times acting within the course and scope of such agency.

**FACTUAL ALLEGATIONS**

**BACKGROUND**

Verified Shareholder Derivative          - 9 -
Complaint

35.     Arena is a clinical-stage biopharmaceutical company focused on discovering, developing and commercializing oral drugs that target GPCRs in four major therapeutic areas: cardiovascular, central nervous system, inflammatory and metabolic diseases. The Company's advanced drug candidate, Lorcaserin, has completed a pivotal Phase III clinical trial program. In December 2009, Arena submitted an NDA for Lorcaserin, its experimental weight loss drug, for regulatory approval.

36.     Numerous drug companies are racing to obtain approval for their weight loss drugs because, in part, there is a dearth of "diet drugs" on the market. The FDA has not approved a prescription weight loss drug in more than a decade. One problem associated with the development and FDA approval of weight loss drugs is and has been the adverse safety profiles of diet drugs. Notably, several years ago, the diet drug known as Fen-phen was pulled from the market because of an adverse safety profile concerning potential damage to heart valves in patients taking the drug. Ever since then, the market and the FDA have been very concerned with the safety profiles of weight loss drugs proposed for FDA approval. As recently as July 2010, the weight loss drug Qnexa, submitted for FDA approval by Vivus Inc., did not receive FDA panel approval due to safety concerns.

37.     Arena's weight loss drug, Lorcaserin, had been studied in animals, including in rat carcinogenicity studies, which defendants admittedly knew were being conducted. The results of the rat carcinogenicity studies became known to defendants before they conducted the Phase III clinical trials. The results of the rat carcinogenicity studies included carcinogenicity signals in the form of mammary tumors.

**THE SECURITIES LAWSUITS ALLEGE THAT THE COMPANY MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

38.     The securities lawsuits referenced above that have been filed against the Company and certain of its directors allege that the Company and certain of its employees and agents engaged in misrepresentations about Lorcaserin's potential throughout the Class Period and by failing to reveal the truth about Lorcaserin's test results when they first learned of it. As similarly alleged in the other securities actions filed, the *Pratt* complaint alleges in paragraphs 32 to 62:

"32. On December 8, 2008, Arena issued a press release announcing the publication of the results of its Phase IIb clinical trial results of Lorcaserin in the official peer reviewed journal of *The Obesity Society*. Defendants discussed the results of the study and the nature of adverse events. Defendant Lief stated:

> The data highlighted in this publication demonstrate lorcaserin's potential to become the first in a new class of weight management agents, thereby addressing an urgent need for new approaches to the obesity epidemic . . . . We are confident the three ongoing lorcaserin Phase 3 trials will build on the clinical data published today, and we eagerly anticipate the announcement of our first Phase 3 data from the BLOOM trial around the end of March 2009. We expect the top-line BLOOM data will be followed by a peer reviewed presentation of the data at a conference later in the year, the announcement of BLOSSOM data in the Fall, and the submission of our New Drug Application to the FDA by the end of 2009.

"33. Upon this news, Arena's stock closed up $0.24 per share to close at $3.84 per share on December 8, 2008. By the end of December 2008, Arena's stock closed at $4.17 per share.

"34. On March 12, 2009, Arena issued a press release announcing its fourth quarter and year end 2008 results. Defendant Lief reported on Lorcaserin in the press release, stating: 'We are excited that in only a few weeks we will be announcing top-line data from the first of two pivotal trials evaluating the safety and efficacy of lorcaserin, which has the potential to be the first in a new class of drugs selectively targeting a well validated weight loss receptor . . . .'

"35. On March 30, 2009, Arena issued a press release announcing positive results from its Phase III BLOOM trial for Lorcaserin. Defendants discussed the results of the study and the nature of adverse events.

"36. On May 11, 2009, Arena issued a press release announcing its first quarter 2009 results. Defendant Lief reported on Lorcaserin in the press release, stating: 'Receiving the positive lorcaserin BLOOM results was a significant milestone for Arena, and we are focusing our financial, management and

Verified Shareholder Derivative                - 11 -
Complaint

development resources on completing the lorcaserin BLOSSOM trial on schedule and submitting our New Drug Application for lorcaserin by the end of the year . . . .'

"37.    On June 17, 2009, Arena announced it had entered into a $100 million credit facility with Deerfield Management ("Deerfield"), a healthcare investment organization and one of the Company's largest stockholders.

"38.    On July 8, 2009, Arena engaged in a public offering of 12.5 million shares of its common stock at a purchase price of $4.17 per share. Arena received $52.1 million in gross proceeds from the offering.

"39.    On August 3, 2009, Arena issued a press release announcing its second quarter 2009 results. Defendant Lief reported on Lorcaserin in the press release, stating: 'We are on track to announce results from the BLOSSOM trial in September, which we expect will be the final piece of lorcaserin's NDA that we plan to submit by the end of this year . . . . Based on its emerging efficacy, safety and tolerability profile, lorcaserin has the potential to be an important new treatment option for patients needing to better manage their weight and improve their overall health. Our improved financial position strengthens our ability to obtain marketing approval for lorcaserin and our position in partnership discussions.'

"40.    On September 18, 2009, Arena issued a press release announcing positive results from its Phase III BLOSSOM trial for Lorcaserin. Defendants discussed the results of the study and the nature and rate of adverse events. Defendant Lief stated:

> "History has taught us that the marriage of efficacy and safety is of critical importance in treating patients. Neither is sufficient without the other. With its excellent safety and tolerability profile, we expect lorcaserin to change the way primary care doctors treat the broad cross-section of overweight and obese patients with pharmacotherapy . . . . With the completion of our robust Phase 3 pivotal program, we will focus on the NDA filing, work with the FDA during the review process and prepare for the commercialization of lorcaserin."

"41. On October 25, 2009, Arena issued a press release announcing additional positive results from its BLOOM trial for Lorcaserin. Defendants discussed the results of the study and the nature and rate of adverse events.

"42. On October 27, 2009, Arena issued a press release announcing additional positive results from its BLOSSOM trial for Lorcaserin. Defendants discussed the results of the study and the nature and rate of adverse events.

"43. On November 9, 2009, Arena issued a press release announcing its third quarter 2009 results. Defendant Lief reported on Lorcaserin in the press release, stating: 'The successful completion of the lorcaserin pivotal program in the third quarter was a critical milestone for Arena . . . . If approved, the unique combination of efficacy, safety and tolerability positions lorcaserin as first-line therapy.'

"44. On December 10, 2009, Arena issued a press release announcing additional published data and additional positive results from its BLOSSOM trial for Lorcaserin. Defendants discussed the results of the study and the nature and rate of adverse events.

"45. On December 22, 2009, Arena submitted its NDA for Lorcaserin based on a data package that included 18 clinical trials totaling 8,576 patients. The pivotal Phase III clinical trial programs, BLOOM (Behavioral modification and Lorcaserin for Overweight and Obesity Management) and BLOSSOM (Behavioral modification and Lorcaserin Second Study for Obesity Management), evaluated nearly 7,200 patients who were treated for up to two years.

"46. On this news, Arena's stock closed up $0.10 per share on December 22, 2009, to close at $3.84 per share. Thereafter, Arena's stock continued to trade in the $3.00-$4.00 per share range for the next six months.

"47. On February 26, 2010, Arena issued a press release announcing that the FDA had assigned a date of October 22, 2010 to review the NDA for Lorcaserin. The press release falsely and misleadingly stated: "In both

Verified Shareholder Derivative       - 13 -
Complaint

1     [BLOOM and BLOSSOM] trials, lorcaserin produced statistically significant weight

2     loss with excellent safety and tolerability."

3          "48.     On March 12, 2010, Arena issued a press release

4     announcing its 2009 results.  Defendant Lief reported on Lorcaserin in the press

5     release, stating: 'We are pleased with the timely execution and significant progress

6     made in our lorcaserin program . . . . [W]e are building a strong foundation for a

7     successful launch upon potential approval.'  The press release reiterated the false and

8     misleading statement made in the February 26, 2010 press release, stating: 'In both

9     [BLOOM and BLOSSOM] trials, lorcaserin produced statistically significant weight

10    loss with excellent safety and tolerability.'

11         "49.    On May 7, 2010, Arena issued a press release announcing

12    its first quarter 2010 results.  Defendant Lief reported on Lorcaserin in the press

13    release, stating: 'We believe that lorcaserin represents a significant medical and

14    commercial opportunity based on the drug candidate's unique combination of safety,

15    efficacy and tolerability in our pivotal trial program.'  The press release contained the

16    further false and misleading statement that '[i]n both [BLOOM and BLOSSOM]

17    trials, lorcaserin produced highly statistically significant weight loss with excellent

18    safety and tolerability.'

19         "50.     On July 1, 2010, Arena issued a press release announcing

20    that the Company had entered into a marketing and supply agreement with Eisai Inc.

21    ("Eisai") related to Lorcaserin.  Pursuant to the agreement, Eisai would have

22    exclusive rights to market and distribute the drug in the United States following the

23    approval of Lorcaserin by the FDA.  Arena would manufacture Lorcaserin and sell

24    the drug to Eisai for marketing and distribution in the United States.  In addition, per

25    the agreement, Arena would receive an upfront payment of $50 million and the

26    Company would further be entitled to received up to an additional $90 million in

27    milestone payments after Lorcaserin received FDA approval.

28

Verified Shareholder Derivative          - 14 -
Complaint

1    "51.    Upon this news, Arena's stock began to climb.  It closed

2    up $0.56, or 16%, to close at $3.56 per share on July 1, 2010.

3    "52.    On July 14, 2010, Arena issued a press release announcing

4    the publication of the results of the two-year BLOOM study in the *New England*

5    *Journal of Medicine*.  Defendants discussed the results of the study and the nature

6    and rate of adverse events.  Defendants failed to include in their discussion of the

7    safety profile of Lorcaserin the adverse results from the rat carcinogenicity studies.

8    "53.    On July 15, 2010, it was announced that the FDA had

9    denied approval for the weight loss drug Qnexa, submitted for approval by Arena's

10   competitor Vivus Inc., due to safety concerns.

11   "54. Upon this news, Arena's stock closed up $0.74, or 18%, to

12   close at $4.66 per share on July 16, 2010.  Thereafter, Arena's stock continued to

13   trend upwards, reaching its Class Period high of $7.95 per share on July 30, 2010.

14   "55.    On August 3, 2010, Arena issued a press release

15   announcing its second quarter 2010 results.  Defendant Lief reported on the

16   upcoming date for the FDA advisory panel meeting for Lorcaserin and reported on

17   results from the Lorcaserin studies, providing data on the benefits of Lorcaserin.

18   Defendants failed to include in their discussion of Lorcaserin the adverse results from

19   the rat carcinogenicity studies.

20   "56. On August 6, 2010, Arena issued a press release confirming

21   the September 16, 2010 date of the FDA Advisory Committee meeting.  Defendant

22   Lief stated: 'We . . . look forward to reviewing lorcaserin's profile with the panel

23   members,' and reiterated the prior false and misleading statement that "[i]n both

24   [BLOOM and BLOSSOM] trials, lorcaserin was well tolerated and produced

25   statistically significant weight loss.'

26   "57.    Further on August 6, 2010, Arena announced that it had

27   entered into an agreement with Deerfield to sell to Deerfield a total of 8,955,224

28   shares of its common stock at a price of $6.70 per share in a registered direct public

Verified Shareholder Derivative          - 15 -
Complaint

1    offering.  Arena received $60 million in gross proceeds from the offering.  Arena

2    further announced that it had also amended its pre-existing credit facility with

3    Deerfield in connection with the offering.

4             "58.    On September 14, 2010, the FDA issued a briefing

5    document in advance of its advisory panel meeting in which the agency questioned

6    both the safety and efficacy of Lorcaserin.  According to the FDA staff scientist's

7    analysis, Lorcaserin produced minimal weight loss results, barely meeting the

8    agency's threshold for weight loss effectiveness, while at the same time raising

9    certain cardiovascular and cancer safety risks.  Most notably, the briefing document

10   disclosed that the drug was associated with malignant tumors in rats.  Investors were

11   not aware of the results of the rat carcinogenicity studies prior to the release of the

12   FDA briefing document.

13            "59.  The market price of Arena common stock plummeted upon

14   this news, collapsing $2.72 per share to close at $4.13 per share on September 14,

15   2010 – a one-day decline of 40% on high volume.

16            "60.    On September 16, 2010, the FDA advisory panel voted 9

17   to 5 against approval of Lorcaserin, in large part because of the results of the rat

18   carcinogenicity studies and the modest therapeutic benefits associated with

19   Lorcaserin.

20            "61.  In a conference call with analysts on September 17, 2010,

21   certain defendants admitted that they were aware of these results but decided not to

22   disclose them to the public because they did not believe they were material.

23            "62.  Arena's stock fell another $1.75 per share to close at $1.99 per share on

24   September 17, 2010 – a one-day decline of over 46% on high volume."

25   39.    As with the other securities actions, the Pratt complaint further alleges Defendants

26   herein concealed the truth and caused the damages to the shareholders, in paragraphs 63 to 64:

27            "63.    The true facts, which were known by the defendants but concealed

28   from the investing public during the Class Period, were as follows:

Verified Shareholder Derivative          - 16 -
Complaint

> (a)   Defendants failed to disclose the truth concerning the potential for increased cardiovascular and cancer safety risks association with Lorcaserin, including the results of the rat carcinogenicity studies; and

> (b)   Defendants failed to disclose the truth concerning the efficacy of Lorcaserin for weight loss.

"64.   As a result of defendants' false statements, Arena stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 75% from their Class Period high."

40.   As with the other securities actions filed, the Pratt complaint further alleges and summarizes its claims against the Company and certain of its directors in paragraphs 65 to 71:

"65. By misrepresenting, *inter alia,* the Company's prospects for its experimental new drug Lorcaserin, the defendants presented a misleading picture of Arena's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Lorcaserin raised certain safety concerns, including the risk of cancer, and only provided a modest weight loss benefit, defendants constantly assured investors that Lorcaserin was safe and effective.

"66. These claims caused and maintained the artificial inflation in Arena's stock price throughout the Class Period and until the truth was revealed to the market.

"67.   On September 14, 2010, the FDA issued a briefing document questioning the efficacy and safety of Lorcaserin, causing Arena's stock to collapse 40% from $6.85 per share to $4.13 per share in one day.

"68.   On September 16, 2010, the FDA advisory panel voted against approving Lorcaserin, finding that the benefits of the drug did not outweigh the risks associated with the drug, causing Arena's stock price to collapse another 46% from $3.74 per share to $1.99 per share in one day.

1    "69. As a direct result of defendants' admissions and the public revelations

2   regarding the truth about Arena's actual business prospects going forward, Arena's

3   stock price fell 75% from its Class Period high, from $7.95 per share on July 30,

4   2010 to close at $1.99 per share on September 17, 2010.  This drop removed the

5   inflation from Arena's stock price, causing real economic loss to investors who had

6   purchased the stock during the Class Period.

7    "70. Arena's verbal "Safe Harbor" warnings accompanying its oral

8   forward-looking statements ("FLS") issued during the Class Period were ineffective

9   to shield those statements from liability.

10    "71. The defendants are also liable for any false or misleading FLS pleaded

11   because, at the time each FLS was made, the speaker knew the FLS was false or

12   misleading and the FLS was authorized and/or approved by an executive officer of

13   Arena who knew that the FLS was false.  None of the historic or present tense

14   statements made by defendants were assumptions underlying or relating to any plan,

15   projection or statement of future economic performance, as they were not stated to be

16   such assumptions underlying or relating to any projection or statement of future

17   economic performance when made, nor were any of the projections or forecasts

18   made by defendants expressly related to or stated to be dependent on those historic or

19   present tense statements when made."

20        **DAMAGES TO THE COMPANY**

21   41. As a result of the Individual Defendants' improprieties, Arena failed to maintain

22 proper internal controls and procedures.  The Company is facing a number of lawsuits alleging

23 violations of the federal securities laws.

24   42. Arena may also have to re-state its previously filed financial earnings after its auditors

25 complete their investigations, which will no doubt cause Arena's stock price to drop even further. As

26 a direct and proximate result of the Individual Defendants' actions as alleged above, Arena's market

27 capitalization has been substantially damaged.

28

1    43.    Further, as a direct and proximate result of Individual Defendants' actions, Arena has
2    expended and will continue to expend significant sums of money that it otherwise would not have
3    had to. Such expenditures include, but are not limited to:

4                (a)    Costs incurred in investigating and defending Arena and certain officers in the
5    securities class actions, plus potentially millions of dollars in settlements or adverse judgment;

6                (b)    Costs incurred from compensation and benefits paid to the Individual
7    Defendants, which compensation was based at least in part on Arena's artificially-inflated stock
8    price and inflated revenues; and

9                **(c)**    Costs incurred from the loss of the Company's customers' confidence in
10    Arena's services.

11    44.    As a result of the Individual Defendants' misconduct, Arena's corporate image and
12    goodwill have been irreparably damaged. Arena's Board has misled the investing public, such that
13    Arena's ability to raise equity capital or debt on favorable terms in the future is now impaired.

14                     **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

15    45.    Plaintiff brings this action derivatively in the right and for the benefit of Arena to
16    redress injuries suffered, and to be suffered, by Arena as a direct result of the breaches of fiduciary
17    duty, as well as the aiding and abetting thereof, and unjust enrichment by the Individual Defendants.
18    Arena is named as a nominal defendant solely in a derivative capacity. This is not a collusive action
19    to confer jurisdiction on this Court that it would not otherwise have.

20    46.    Plaintiff will adequately and fairly represent the interests of Arena in enforcing and
21    prosecuting its rights.

22    47.    Plaintiff has continuously held the stock of Arena during all times relevant to the
23    Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the
24    Company.

25    48.    Arena's three committees consist of only independent directors, i.e., non-employee
26    directors. Arena claims that such composition leads to better oversight but in fact the lack of proper
27    oversight and intervention by the committees led to the present situation wherein the Company finds
28    itself sued for violating the securities laws.

Verified Shareholder Derivative                - 19 -
Complaint

49.     The current Board of Arena consists of the following nine individuals: defendants Lief, Behan, Belcher, Bice, Hixson, Nova, Schneider, White, and Woods.   Plaintiff has not made any demand on the present Board of Arena to institute this action because such a demand would be a futile, wasteful and useless act.  Demand is futile for a combination of the following reasons, as set forth in paragraphs 48 through 58.

50.     Defendant Lief is co-founder, President, Chairman of the Board and Chief Executive Officer of the Company.   The principal professional occupation of Lief is his employment with Arena, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  In fact, over the past 3 years, Arena has paid Lief the following compensation: 2007: $2,435,491; 2008: $1,645,475; 2009: $1,563,992.  Lief was given 300,000 shares of stock by the Company as a "Performance – Based" award in 2007.  As of March 10, 2010, Lief owned 1,369,357 shares of the Company, or 1.34%, including shares that could be purchased through stock options within 60 days. Given his personal ties to the Company, as well as his significant compensation, Lief is not capable of fairly considering a demand that he initiate this lawsuit against himself or his fellow directors.

51.     Further, as Chairman, President, and CEO, Lief is ultimately responsible for ensuring that Arena maintains effective controls and complies with state and federal laws and regulations. As discussed above, Lief breached these duties and, thus, is not capable of fairly considering a litigation demand.

52.     In addition, Lief signed the Certification for the Company's SEC Form 10-K for the fiscal year ended December 31, 2009.  Thus, Lief faces a substantial threat of liability should it be determined that the information contained therein is unreliable.

53.     Defendant Behan is co-founder, director, Senior Vice President and Chief Scientific Officer of the Company. The principal professional occupation of Behan is his employment with Arena, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  In fact, over the past 3 years, Arena has paid Behan the following compensation: 2007: $995,213; 2008: $748,187; 2009: $715,327.  Behan was given 100,000 shares of stock by the Company as a "Performance – Based" award in 2007.  As of March 10, 2010, Behan owned 761,948

Verified Shareholder Derivative                - 20 -
Complaint

1  shares of the Company, including shares that could be purchased through stock options within 60

2  days. Given his personal ties to the Company, as well as his significant compensation, Behan is not

3  capable of fairly considering a demand that he initiate this lawsuit against himself or his fellow

4  directors.

5       54.    Defendant Belcher has been a member of the Board of Directors since 2003. He is a

6  member of the Audit Committee and the Chair of the Compensation Committee.  The Audit

7  Committee is responsible for ensuring that Arena complies with all laws and regulations that have a

8  material impact on the Company's financial statements.  The failure to disclose the truth about

9  Lorcaserin will have a material impact on the Company's financial statements.  As such, Belcher

10 faces a substantial threat of liability such that he cannot fairly consider a litigation demand.  As of

11 March 10, 2010, Behan owned 194,100 shares of the Company, including shares that could be

12 purchased through stock options within 60 days. As an outside director of the Company, he is paid a

13 minimum of $20,000 per year, in cash or stock options, to be on the Board, and additional cash

14 payments of $500 to $3,000 for each board or committee meeting attended.

15      55.    Defendant Bice has been a member of the Board of Directors since 2003.  Bice is a

16 member of the Compensation Committee and the Corporate Governance and Nominating

17 Committee. The Corporate Governance Committee is charged with providing accurate information

18 to the Board on a timely basis and to periodically review and assess the performance of the Board

19 and each of its committees, as well as reviewing the independence of any director.  The failure to

20 disclose the truth about Lorcaserin establishes the Corporate Governance Committee has not

21 adequately performed its duties.  As such, Bice faces a substantial threat of liability such that he

22 cannot fairly consider a litigation demand.  As of March 10, 2010, Bice owned 95,667 shares of the

23 Company, including shares that could be purchased through stock options within 60 days. As an

24 outside director of the Company, he is paid a minimum of $20,000 per year, in cash or stock options,

25 to be on the Board, and additional cash payments of $500 to $3,000 for each board or committee

26 meeting attended.

27      56.    Defendant Hixson has been a member of the Board of Directors since 2004. Hixson

28 is a member of the Corporate Governance and Nominating Committee. The Corporate Governance

Verified Shareholder Derivative            - 21 -
Complaint

Case 3:10-cv-02344-BTM -BLM   Document 1   Filed 11/12/10   Page 22 of 28

1  Committee is charged with providing accurate information to the Board on a timely basis and to
2  periodically review and assess the performance of the Board and each of its committees, as well as
3  reviewing the independence of any director.  The failure to disclose the truth about Lorcaserin
4  establishes the Corporate Governance Committee has not adequately performed its duties.  As such,
5  Hixson faces a substantial threat of liability such that he cannot fairly consider a litigation demand.
6  As of March 10, 2010, Hixson owned 234,110 shares of the Company, including shares that could be
7  purchased through stock options within 60 days. As an outside director of the Company, he is paid a
8  minimum of $20,000 per year, in cash or stock options, to be on the Board, and additional cash
9  payments of $500 to $3,000 for each board or committee meeting attended.

10      57.      Defendant Nova  been a member of the Board of Directors since 2004.  Nova is a
11  member of the Corporate Governance and Nominating Committee.  The Corporate Governance
12  Committee is charged with providing accurate information to the Board on a timely basis and to
13  periodically review and assess the performance of the Board and each of its committees, as well as
14  reviewing the independence of any director.  The failure to disclose the truth about Lorcaserin
15  establishes the Corporate Governance Committee has not adequately performed its duties.  As such,
16  Nova faces a substantial threat of liability such that she cannot fairly consider a litigation demand.
17  As of March 10, 2010, Nova owned 83,000 shares of the Company, including shares that could be
18  purchased through stock options within 60 days. As an outside director of the Company, he is paid a
19  minimum of $20,000 per year, in cash or stock options, to be on the Board, and additional cash
20  payments of $500 to $3,000 for each board or committee meeting attended.

21      58.      Defendant Schneider has been a member of the Board of Directors since 2007.
22  Schneider is the Chair of the Audit Committee.  The Audit Committee is responsible for ensuring
23  that Arena complies with all laws and regulations that have a material impact on the Company's
24  financial statements.  The failure to disclose the truth about Lorcaserin will have a material impact
25  on the Company's financial statements.  As such, Schneider faces a substantial threat of liability
26  such that he cannot fairly consider a litigation demand.  As of March 10, 2010, Schneider owned
27  69,624 shares of the Company, including shares that could be purchased through stock options
28  within 60 days. As an outside director of the Company, he is paid a minimum of $20,000 per year, in

Verified Shareholder Derivative          - 22 -
Complaint

1   cash or stock options, to be on the Board, and additional cash payments of $500 to $3,000 for each

2   board or committee meeting attended.

3          59.    Defendant White has been a member of the Board of Directors since 2006.  She has

4   been since November 2008 the "lead independent director" and as such, has worked closely with

5   Lief, the Chairman of the Board and the President and CEO.  White is or was a member of the Audit

6   Committee and the Chair of the Corporate Governance and Nominating Committee.  The Audit

7   Committee is responsible for ensuring that Arena complies with all laws and regulations that have a

8   material impact on the Company's financial statements.  The failure to disclose the truth about

9   Lorcaserin will have a material impact on the Company's financial statements.  As such, White faces

10  a substantial threat of liability such that she cannot fairly consider a litigation demand.   The

11  Corporate Governance Committee is charged with providing accurate information to the Board on a

12  timely basis and to periodically review and assess the performance of the Board and each of its

13  committees, as well as reviewing the independence of any director.  The failure to disclose the truth

14  about Lorcaserin establishes the Corporate Governance Committee has not adequately performed its

15  duties.  As such, White faces a substantial threat of liability such that he cannot fairly consider a

16  litigation demand.  As of March 10, 2010, White owned 114,068 shares of the Company, including

17  shares that could be purchased through stock options within 60 days. As an outside director of the

18  Company, she is paid a minimum of $20,000 per year, in cash or stock options, to be on the Board,

19  and additional cash payments of $500 to $3,000 for each board or committee meeting attended.

20          60.    Defendant Woods has been a member of the Board of Directors since 2007.  Woods

21  is a member of the Corporate Governance and Nominating Committee and the Compensation

22  Committee. The Corporate Governance Committee is charged with providing accurate information

23  to the Board on a timely basis and to periodically review and assess the performance of the Board

24  and each of its committees, as well as reviewing the independence of any director.  The failure to

25  disclose the truth about Lorcaserin establishes the Corporate Governance Committee has not

26  adequately performed its duties.  As such, Woods faces a substantial threat of liability such that he

27  cannot fairly consider a litigation demand.   As of March 10, 2010, Woods owned 60,624 shares of

28  the Company, including shares that could be purchased through stock options within 60 days. As an

Verified Shareholder Derivative                - 23 -
Complaint

1  outside director of the Company, he is paid a minimum of $20,000 per year, in cash or stock options,
2  to be on the Board, and additional cash payments of $500 to $3,000 for each board or committee
3  meeting attended.

4  <center>**FIRST CAUSE OF ACTION**</center>

5  <center>**Against All Individual Defendants for Breach of Fiduciary Duty (Misrepresentations)**</center>

6  61.    Plaintiff incorporates by reference and realleges each and every allegation contained
7  above, as though fully set forth herein.

8  62.    The Individual Defendants owed and owe Arena fiduciary obligations.  By reason of
9  their fiduciary relationships, the Individual Defendants owed and owe Arena the highest obligation
10  of good faith, fair dealing, loyalty and due care.

11  63.    The Individual Defendants, and each of them, violated and breached their fiduciary
12  duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

13  64.    Each of the Individual Defendants had actual or constructive knowledge that they had
14  caused the Company to make only truthful, complete and honest representations to the marketplace.
15  These actions were not a good faith exercise of prudent business judgment to protect and promote
16  the Company's corporate interests.

17  65.    As a direct and proximate result of the Individual Defendants' failure to perform their
18  fiduciary obligations, Arena has sustained significant damages.  As a result of the misconduct
19  alleged herein, the Individual Defendants are liable to the Company.

20  66.    Additionally, by their actions alleged herein, the Individual Defendants, either
21  directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary
22  duties with regard to prudently managing the assets and business of Arena in a manner consistent
23  with the operations of a publicly held corporation.

24  67.    As a direct and proximate result of the Individual Defendants' mismanagement and
25  breaches of duty alleged herein, Arena has sustained significant damages in excess of the jurisdiction
26  of this Court.  As a result of the misconduct and breaches of duty alleged herein, the Individual
27  Defendants are liable to the Company.

28  68.    Plaintiff, on behalf of Arena have no adequate remedy at law.

Verified Shareholder Derivative                    - 24 -
Complaint

<div align="center">

**COUNT I**

**For Waste of Corporate Assets Against the Individual Defendants**

</div>

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) failing to conduct proper supervision; (ii) paying bonuses to certain of its executive officers; and (iii) by incurring potential tens of millions of dollars in legal liability and/or legal costs to defend defendants' unlawful action.

71.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

72.     Plaintiff, on behalf of Arena, has no adequate remedy at law.

<div align="center">

**COUNT II**

**Against All Defendants for Unjust Enrichment**

</div>

73.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Arena.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Arena.

75.     Plaintiff, as a shareholder and representative of Arena, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

76.     Plaintiff, on behalf of Arena, has no adequate remedy at law.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary

Verified Shareholder Derivative                     - 25 -
Complaint

1    duties and unjust enrichment;

2        B.     Directing Arena to take all necessary actions to reform and improve its corporate

3 governance and internal procedures to comply with applicable laws and to protect Arena and its

4 shareholders from a reoccurrence of the damaging events described herein, including, but not limited

5 to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

6 Articles of Incorporation and taking such other action as may be necessary to place before

7 shareholders for a vote the following Corporate Governance Policies:

8           1.     a proposal to strengthen the Board's supervision of operations and develop

9 and implement procedures for greater shareholder input into the policies and guidelines of the Board;

10          2.     a provision to permit the shareholders of Arena to nominate at least three

11 candidates for election to the Board;

12          3.     a proposal to ensure the accuracy of the qualifications of Arena's directors,

13 executives and other employees;

14          4.     a proposal to strengthen the Company's procedures for the receipt, retention

15 and treatment of complaints received by the Company regarding accounting, internal controls and

16 auditing matters; and

17          5.     appropriately test and then strengthen the internal audit and control functions.

18        C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

19 statutory provisions sued hereunder so as to assure that Plaintiff, on behalf of Arena, has an effective

20 remedy;

21        D.     Awarding to Arena restitution from the defendants, and each of them, and ordering

22 disgorgement of all profits, benefits and other compensation obtained by the defendants;

23        E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable

24 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

25

26

27

28

Verified Shareholder Derivative        - 26 -
Complaint

1    F.    Granting such other and further relief as the Court deems just and proper.

2                                    **JURY DEMAND**

3    Plaintiff demands a trial by jury on matters triable by jury.

4

5    Dated:  November 12, 2010          **LAW OFFICES OF RONALD A. MARRON, APLC**

6

7                              _____

8                                    RONALD A. MARRON

9

10

11

12

13

14

15                                   **VERIFICATION**

16   I, Ronald A. Marron, hereby declare as follows:

17      1.   I am a principal and owner of the Law Offices of Ronald A. Marron, APLC, counsel for

18   Plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents

19   thereof.  I am informed and believe the matters therein are true and on that ground allege that the

20   matters stated therein are true.

21      2.   I make this Verification because Plaintiff is absent from the County of San Diego where

22   I maintain my office.

23      Executed this _____ day of November, 2010 at San Diego, California under the laws of

24   the United States.

25

26                              _____

27                                    Ronald A. Marron

28

Verified Shareholder Derivative              - 27 -
Complaint

℀JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Martin Gore, et al., derivatively on behalf of Arena Pharmaceuticals | Jack Lief, Dominic P. Behan, Donald D. Belcher, Scott H. Bice, Harry F. Hixson, Jr., Tina S. Nova, Scott M. Schneider, ⊞ |
| **(b)** County of Residence of First Listed Plaintiff  San Diego | County of Residence of First Listed Defendant  San Diego |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
| Law Offices of Ronald A. Marron, 3636 Fourth Ave., Suite 202, San Diego, CA 92103 (619) 696-9006 ⊞ | '10 CV 2344 JM   NLS |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
        Plaintiff

☐ 3  Federal Question
        (U.S. Government Not a Party)

☒ 2  U.S. Government
        Defendant

☒ 4  Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original
        Proceeding

☐ 2  Removed from
        State Court

☐ 3  Remanded from
        Appellate Court

☐ 4  Reinstated or
        Reopened

☐ 5  Transferred from
        another district
        (specify)

☐ 6  Multidistrict
        Litigation

☐ 7  Appeal to District
        Judge from
        Magistrate
        Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause:
Derivative case against board of directors for wrongdoing.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☑ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  Moskowitz

DOCKET NUMBER  10cv2079-BTM-BLM

DATE
11/12/2010

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE